APPEARANCES
Plaintiff: Pro se.
Defendant: Smith Moore Leatherwood, Attorneys, Greensboro, North Carolina; Caroline H. Lock, Counsel of Record.
 *********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour, and the briefs and arguments of the *Page 2 
parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission has also reviewed Defendant's Motion to Amend, the exhibits attached thereto, and plaintiff's response to Defendant's Motion to Amend. In the exercise of its discretion pursuant to Rule 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, and in the interest of judicial economy, the Full Commission has received into evidence Exhibit B to Defendant's Motion to Amend, consisting of plaintiff's Form 18 dated "5/__/10," and Exhibit C to Defendant's Motion to Amend, consisting of Old Dominion Freight Line, Inc.'s Detail Claim Listing dated November 11, 2008. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Baddour, with additional findings of fact and conclusions of law as necessary to reflect its ruling on Defendant's Motion to Amend the Opinion and Award previously filed on June 4, 2010.
 *********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in the Pretrial Agreement as:
 STIPULATIONS
1. The parties are correctly designated and there is no question as to misjoinder or nonjoinder of parties.
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. At all times relevant hereto an employer-employee relationship existed between the plaintiff and defendant-employer. *Page 3 
4. Plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer on May 24, 2007.
 ********* EXHIBITS
The following exhibits were admitted into evidence:
 (a) Stipulated Exhibit 1: Pre-Trial Agreement
 (b) Stipulated Exhibit 2: Plaintiff's Employment Records, Industrial Commission Forms, and Plaintiff's Medical Records
 ********* ISSUES (a) To what benefits, if any, is plaintiff entitled for temporary total disability, permanent partial disability and medical treatment as a result of his injury by accident on May 24, 2007?
 (b) Whether plaintiff refused suitable employment, both actually and constructively, within the meaning of N.C. Gen. Stat. § 97-32 and Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996)?
 *********
Based upon all of the competent evidence of record, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff was born on May 10, 1971, and he graduated from high school. He completed truck driver training at a local community college and received his CDL license in 2001. Plaintiff is also certified to drive a forklift.
2. Plaintiff's prior work experience includes working as a mixer and an inventory clerk at Flowers Bakery from 1991 to 1994, working in sanitation and as an order puller at Food Lion Warehouse from 1994 to 2001, driving trucks for Corriher Trucking from February 2006 to May 2006, and working as a switcher for Universal Forest from May 2006 to July 2006.
3. In October 2001, plaintiff also began working for Ms. Charlotte Carter at Carter Enterprises in Salisbury, an entity that operates a group home for disabled veterans. Ms. Carter is plaintiff's cousin. Plaintiff's duties at Carter Enterprises included taking care of disabled veterans and performing maintenance work such as painting and yard work. Plaintiff initially worked full time for Carter Enterprises, but at some point began working only part-time for that employer.
4. Plaintiff was still working for Carter Enterprises in October 2006 when he applied for a part-time dock worker position with defendant, and in April 2007 when he applied for a truck driver position with defendant. Plaintiff testified that he last worked for Carter Enterprises some time in 2007, and that, while he may have gone to Ms. Carter's home to sit with the veterans for her after that point, she did not pay him wages, but only "gifts." Plaintiff's testimony in that regard is not accepted as credible by the Full Commission.
5. Plaintiff began working as a part-time dock worker for defendant in October 2006. His job consisted of driving a forklift to load and unload trucks at defendant's Charlotte service center, and he was scheduled to begin work each evening at 6:00 p.m. *Page 5 
6. On May 24, 2007, plaintiff was loading rolls of carpet onto a trailer at work when some steel bundles shifted and struck Plaintiff's right lower leg in the shin area. Plaintiff reported the incident to his supervisor, who took him to Concentra Medical Center for medical treatment.
7. On May 24, 2007, plaintiff was evaluated by Dr. Margaret Grossman at Concentra Medical Center for complaints of pain in his right lower leg. Plaintiff's physical examination was within normal limits except for two abrasions approximately four centimeters long on the anterior aspect of the right shin. X-rays of plaintiff's right lower leg were negative for fracture or dislocation. Dr. Grossman's assessment was crush injury, right lower leg, abrasion, lower leg, and contusion, right lower leg. Dr. Grossman prescribed medication, physical therapy, an ice/cold pack, and instructed Plaintiff to return for a recheck on May 25, 2007. She also recommended modified duty work with no prolonged standing/walking longer than 20 minutes per hour, and sitting 60% of the time. Dr. Grossman anticipated that plaintiff would reach maximum medical improvement on June 7, 2007.
8. Plaintiff returned to Dr. Grossman on May 25, 2007 and reported that his symptoms were improving. A physical examination by Dr. Grossman was within normal limits except for the abrasions on the anterior aspect of plaintiff's lower right leg, which were healing well, and tenderness on the anterior part of the shin. Dr. Grossman felt that plaintiff was improving. She recommended physical therapy and modified duty work. Plaintiff was to return to see Dr. Grossman and the physical therapist on June 1, 2007.
9. On May 29, 2007, the Tuesday after the Memorial Day holiday, Rene Hartsell, defendant's administrative clerk, called plaintiff to advise him that defendant had modified duty work available for plaintiff within the restrictions assigned by Dr. Grossman. Ms. Hartsell *Page 6 
instructed plaintiff to report for work at 6:00 p.m. that evening, which was his regularly scheduled work time. Plaintiff told Ms. Hartsell that he would do so, but he later called back to tell her know he would be late because he forgot about a meeting he had at his other place of employment, Carter Enterprises in Salisbury. Plaintiff clocked in for work at 6:39 p.m. that evening and worked approximately 3.35 hours, clocking out at 10:00 p.m. During that time period, plaintiff used a compressed air hose to blow up air bags weighing less than one pound and placed them in designated locations in trailers. Plaintiff also sat in the parking lot and checked trailer locks and wrote down trailer numbers as they went through the gate to the parking lot. The latter job was performed sitting down, and plaintiff admitted that he was able to do that job. Plaintiff also could have blown up air bags in a seated position.
10. On May 30, 2007, and again on May 31, 2007, plaintiff called Ms. Hartsell to say that he would not be coming in to work modified duty because of car trouble. On May 31, 2007, Ms. Hartsell told plaintiff it was his responsibility to find transportation to work, that he should report for modified duty, and that if he did not work he would not get paid. Defendant had suitable modified duty work available for plaintiff on May 30, 2007 and May 31, 2007, but plaintiff did not report work on either day.
11. On June 1, 2007, plaintiff did not keep his scheduled appointments at Concentra Medical Center, and he did not report for modified duty work with defendant or call Ms. Hartsell or anyone else at defendant's service center to notify them that he would not be reporting for work that evening. Defendant had suitable modified duty work available for plaintiff on June 1, 2007.
12. On June 4, 2007, plaintiff called Ms. Hartsell and told her that he still had car trouble but that his leg was hurting and that he would not be reporting for work that evening. *Page 7 
Ms. Hartsell told plaintiff that he should go to Concentra to be evaluated. Plaintiff did not work on June 4, 2007. Defendant had suitable modified duty work available for plaintiff on June 4, 2007.
13. From May 30, 2007 through June 4, 2007, plaintiff unjustifiably refused suitable modified duty work offered to him by defendant.
14. On June 5, 2007, plaintiff was evaluated by Geoff Barnum, a physical therapist at Concentra Medical Center. Physical examination of plaintiff's right leg was within normal limits except for healing abrasions and tenderness on the anterior aspect of the tibia. Plaintiff responded well to physical therapy treatment that day.
15. Dr. Grossman also re-evaluated plaintiff on June 5, 2007, and there were no abnormal findings with the exception of plaintiff's complaint of tenderness in the shin area. Dr. Grossman felt that plaintiff was recovering from his injury. She recommended continuing therapy and no walking/standing in excess of twenty minutes per hour.
16. On June 5, 2007, plaintiff's employment was terminated by defendant due to falsification of his application to attend defendant's driver training school. On that application, plaintiff was asked to list traffic convictions and forfeitures for the past seven years, and he responded that he had none. Plaintiff was also asked on the application whether any license, permit, or privilege had even been suspended or revoked, and he checked "no." In fact, plaintiff had pleaded guilty in August 2005 to speeding 61 in a 45 mile per hour zone, had been convicted in January 2006 of failure to pay the fine in connection with that speeding charge, and had his CDL license suspended in March 2006 because of failure to pay that fine. Plaintiff testified at the hearing before the Deputy Commissioner that he thought he had a prayer for judgment continued, or "PJC," with respect to the speeding charge, that the attorney who represented him *Page 8 
on that charge did not pay the court fees, and that plaintiff was not aware that he had a conviction as a result of the nonpayment of the fine. Plaintiff admitted, however, that he was aware his CDL license had been suspended, because he testified that when he went to the courthouse to get things straightened out, he had to pay off the fines and that his license was thereafter reinstated.
17. Defendant's policy calls for termination of employees who make misrepresentations or falsifications on applications. From 2003 to the present, approximately eight other employees at defendant's Charlotte facility have been terminated for falsification of their application, and none of those employees had sustained any work related injury or filed a workers' compensation claim. Plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by defendant.
18. If plaintiff's employment had not been terminated on June 5, 2007 due to his misconduct, defendant would have continued to have suitable modified duty work available for him within the restrictions assigned by Dr. Grossman.
19. Plaintiff returned to Concentra Medical Center for physical therapy on June 7, 2007, at which time he told Mr. Barnum, the therapist, that he had been working modified duty with acceptable tolerance. In fact, however, plaintiff's employment with defendant had been terminated on June 5, 2007.
20. Plaintiff's final physical therapy appointment was on June 12, 2007, and on that date he was able to push and pull 200 pounds on a sled fifty feet five times, ride a stationary bicycle for ten minutes, do tandem walking 2 x 50 feet, do fifty reps of stair climbing, hamstring stretches, standing hamstring curls, ten reps of eight inch step-ups, gastroc stretches, thirty heel *Page 9 
raises, and five minutes of weight shifting with five seconds on one foot and then five seconds on the other foot.
21. Plaintiff was also evaluated by Dr. Grossman on June 12, 2007. He reported that his symptoms were improving and that he felt better. Plaintiff also told Dr. Grossman that he had been working regular duty and that he did get some pain at the end of the work day. However, plaintiff had not worked for defendant since May 29, 2007, and his employment with defendant had been terminated on June 5, 2007.
22. Dr. Grossman's physical examination of plaintiff's right leg on June 12, 2007 revealed full range of motion, no erythema, no knee effusion or deformity, and no ecchymosis. There were no abnormalities in plaintiff's right leg, and Dr. Grossman saw no evidence of any nerve damage, muscle damage, vascular or peripheral artery damage, bone damage, joint or tendon damage, or thrombophlebitis. Dr. Grossman saw no evidence of any permanent injury or impairment to plaintiff's right leg. She released plaintiff at maximum medical improvement with no work restrictions and with a note to return to regular duty work as of June 12, 2007.
23. On or about June 28, 2007 plaintiff filed Forms 18 and 33 with the Industrial Commission, indicating that the only body part injured as a result of the accident on May 24, 2007 was his right lower leg.
24. On July 19, 2007, plaintiff was seen on his own by Dr. Christopher K. Nagy at Salisbury Orthopedic Associates, without authorization from defendant. Dr. Nagy was aware that plaintiff had seen another physician for his right leg complaints, but he did not review any records from Dr. Grossman or the physical therapist at Concentra Medical Center.
25. On July 19, 2007, plaintiff had subjective complaints of pain in his right leg, but Dr. Nagy's physical examination revealed that plaintiff's skin was nicely healed, he was *Page 10 
neurovascularly intact, and he had no deformities. Plaintiff also had subjective complaints of tenderness on the proximal medial aspect of the tibia, which is the part of the shin bone located closer to the knee, and dysesthesias, or diminished light touch, over the medial leg region. While Dr. Nagy's assessment was crush injury to the right leg, he explained that this meant simply a soft tissue injury or contusion, and that the only basis for that assessment was the mechanism of injury that plaintiff had described.
26. On July 19, 2007, Dr. Nagy found no objective evidence of any injury or damage to any of the structures of plaintiff's right leg, no muscle atrophy, no decrease in motor function or strength, no swelling in the knee, leg, ankle, or foot, no warmth or redness, no changes in skin color, texture, or hair distribution, no muscle damage, no nerve damage, no bone damage, no joint damage, no tendon damage, no vascular or peripheral artery damage or injury, and no superficial phlebitis or thrombophlebitis. There was no evidence of any physical limitations with respect to plaintiff's right leg other than plaintiff's subjective complaint of pain. Dr. Nagy's recommendation was simply that plaintiff "carry on" with his normal activities. There was no specific treatment that Dr. Nagy thought plaintiff needed. Dr. Nagy did not give plaintiff a note to be out of work, and he did not assign any work restrictions, because he felt that plaintiff was capable of full duty work with no restrictions.
27. Plaintiff returned to Dr. Nagy on August 16, 2007. Physical examination revealed no objective findings or abnormalities, only plaintiff's subjective complaint of tenderness over the medial tibial region. Dr. Nagy's plan was the same as before, to "carry on" and continue normal activities, and he did not give plaintiff a note to be out of work or assign any work restrictions. It continued to be Dr. Nagy's opinion that there was no reason plaintiff could not do his regular job without restrictions. *Page 11 
28. Plaintiff returned to Dr. Nagy on September 27, 2007, reporting that he was improved, and there was no change in his physical examination. Dr. Nagy again recommended that plaintiff continue with his normal activities and return only on an as needed basis. Dr. Nagy felt that there was nothing he could do to make plaintiff feel better, because there was no objective evidence of any injury or problem. Dr. Nagy did not give plaintiff a note to be out of work and did not assign any work restrictions, because he continued to believe that plaintiff was capable of full duty work.
29. Plaintiff returned to Dr. Nagy on October 16, 2007, continuing to complain of pain in the right leg. Physical exam was essentially unchanged, with the exception of some diffuse swelling in the leg and ankle region. Given the time lag between the development of this swelling and the incident on May 24, 2007, Dr. Nagy testified, and the Full Commission hereby finds, that the swelling was "probably not" related to that incident. Dr. Nagy did not devise a plan for plaintiff because he did not see anything that required a plan; plaintiff simply had a contusion that should get better. Dr. Nagy noted at his deposition that plaintiff simply kept coming back for something that did not seem like a big deal.
30. On or about October 16, 2007, Dr. Nagy responded to several questions from plaintiff's counsel. While Dr. Nagy indicated that his diagnosis was status post crush injury right leg with residual pain, he clarified in his deposition that there was no objective evidence of any crush injury as of October 2007, and that plaintiff's residual pain was only a subjective complaint.
31. While Dr. Nagy indicated on the questionnaire that plaintiff's condition was caused by the incident on May 24, 2007, he admitted that this opinion was based solely on plaintiff's complaints and a temporal relationship between the incident and those complaints. *Page 12 
Dr. Nagy was not able to determine anything objective or physiological that would explain plaintiff's ongoing subjective complaints of pain.
32. While Dr. Nagy wrote on the questionnaire that plaintiff was unable to be on his feet for extended periods of time following his injury secondary to pain, Dr. Nagy conceded at his deposition that this statement was based solely on plaintiff's subjective report. Dr. Nagy was never able to find any objective explanation for why plaintiff would not be able to be on his feet for extended periods of time.
33. While Dr. Nagy wrote on the questionnaire that it was hard to determine whether plaintiff was currently disabled from gainful employment and that he would recommend a functional capacity evaluation to determine plaintiff's true abilities, Dr. Nagy testified that he would defer to Dr. Grossman on this issue, because Dr. Grossman had the benefit of reviewing plaintiff's physical therapy records.
34. While Dr. Nagy indicated on the questionnaire that plaintiff might have difficulty jumping or impact loading on the right leg secondary to pain, he explained at his deposition that this comment was based solely on plaintiff's subjective complaints of pain as opposed to objective findings. Dr. Nagy had no evidence or information that plaintiff's job with defendant involved any jumping or impact loading on the right leg. Dr. Nagy had no objective evidence to believe that plaintiff was disabled from any type of employment when he filled out the October 2007 questionnaire.
35. Dr. Nagy also wrote that he did not expect any permanent disability as a result of plaintiff's accident, because there was no evidence of any permanent impairment or disability at that time. While Dr. Nagy wrote that treatment had not been effective, he explained that plaintiff *Page 13 
was simply continuing to have subjective complaints of pain. Dr. Nagy admitted that there really had not been any treatment, because he never found any objective medical condition to treat.
36. Plaintiff returned to Dr. Nagy on December 18, 2007, and Dr. Nagy noticed for the first time on that visit some superficial phlebitis or a palpable thrombosed saphenous vein that was tender. Dr. Nagy could not say that this condition was causally related to the incident on May 24, 2007.
37. Plaintiff returned to Dr. Nagy on March 12, 2008, continuing to complain of intermittent pain in his right leg that was variable in its presentation. Examination revealed some palpable cords over the saphenous vein and some irritability of the saphenous nerve and a positive Tinel's there. Given that plaintiff had never had a positive Tinel's prior to March 12, 2008, Dr. Nagy agreed, and the Full Commission hereby finds, that this was probably due to some irritation from the thrombosed saphenous vein and not due to any injury to the nerve caused by the incident on May 24, 2007. Dr. Nagy still felt that plaintiff was capable of working with no restrictions as of March 12, 2008.
38. On or about March 18, 2008, Dr. Nagy generated a note at plaintiff's request, which indicated that plaintiff had reached maximum medical improvement and had a 5% permanent partial impairment rating to the right leg. At his deposition, however, Dr. Nagy admitted that his assignment of a disability rating at that point was based solely on plaintiff's subjective complaints of pain and not on any objective physical findings or a review of any guides to the evaluation of permanent partial impairment. Dr. Nagy would defer to Dr. Grossman and Dr. DuPuy on the issue of permanent partial impairment. After evaluating the entirety of Dr. Nagy's testimony, the Full Commission gives no weight to Dr. Nagy's opinion that plaintiff has a 5% permanent partial impairment rating to the right leg. *Page 14 
39. Plaintiff's final visit to Dr. Nagy was on May 21, 2008, at which time his physical examination was essentially the same. Dr. Nagy continued to believe that there was no objective evidence of any injury or condition that would be disabling in any way, and that plaintiff was capable of full duty work with no restrictions. Dr. Nagy agreed that plaintiff's subjective complaints of pain were out of proportion to and inconsistent with his objective findings on physical examination.
40. On or about November 18, 2008, plaintiff filed with the Industrial Commission another Form 33, Request for Hearing, again indicating that the only part of the body injured as a result of the incident on May 24, 2007, was his right lower leg.
41. On February 9, 2009, plaintiff was seen for an independent medical evaluation by Dr. David DuPuy at OrthoCarolina in Charlotte. Dr. DuPuy reviewed the records documenting plaintiff's prior treatment by Dr. Grossman at Concentra Medical Center and by Dr. Nagy. Plaintiff complained of pain in his right leg with associated bruising. Plaintiff walked with a limp, but Dr. DuPuy found no objective explanation for that limp. Physical examination by Dr. DuPuy was within normal limits, with no knee effusion or tenderness, no muscle atrophy, no swelling of the ankle or foot, no warmth or redness, no change in skin color or texture or hair distribution, and no evidence of causalgia or reflex sympathetic dystrophy. Plaintiff did describe subjective tingling along the medial aspect of the distal third of the tibia to the ankle, which Dr. DuPuy noted was different from what Dr. Nagy described at the proximal tibia and knee area. X-rays of plaintiff's right leg were within normal limits, with no evidence of fracture or dislocation. Dr. DuPuy saw no evidence of bruising consistent with plaintiff's subjective complaint of bruising. There was nothing objectively abnormal about Dr. DuPuy's physical examination of plaintiff's right leg. *Page 15 
42. Dr. DuPuy's impression on February 9, 2009 was contusion of the right leg, and he found no objective physiological basis for plaintiff's subjective complaints of pain. Plaintiff's subjective complaints were inconsistent with Dr. DuPuy's objective physical examination of him, and there was evidence of symptom magnification. Dr. DuPuy agreed with Dr. Grossman that plaintiff had reached maximum medical improvement from his right leg injury by June 12, 2007 when Dr. Grossman released plaintiff from her care. Based on his examination of plaintiff and his failure to find any objective evidence of any damage to any part of plaintiff's right leg, Dr. DuPuy found no evidence of any permanent partial impairment. While Dr. DuPuy speculated that plaintiff could possibly have a neuritis of a sensory nerve, he was not certain what might have caused it, and he felt that it would completely heal on its own. Dr. DuPuy also agreed that plaintiff is and has been capable of regular duty work with no restrictions as of the date of his release by Dr. Grossman on June 12, 2007.
43. Plaintiff testified that he has not worked since May 24, 2007. He denied continuing to work for Carter Enterprises and contended that, while he may have sat with veterans for Ms. Carter, he was not paid wages and only received "gifts." Plaintiff's testimony in this regard is not accepted as credible by the Full Commission.
44. Plaintiff also acknowledged that he spends a considerable amount of time with Mr. Daniel Burch, an elderly gentleman in Salisbury, and in fact had lived at Mr. Burch's home for the two weeks preceding the hearing. Plaintiff also admitted to driving Mr. Burch to Food Lion, the Dollar Store, and McDonald's and doing other errands for him. Plaintiff admitted that Mr. Burch occasionally gave him money if he needed it, but he denied that he was working for or taking care of Mr. Burch in exchange for wages. Plaintiff's testimony in this regard is not accepted as credible by the Full Commission. *Page 16 
45. Plaintiff's testimony and subjective complaints about ongoing right leg pain and inability to work since his release by Dr. Grossman on June 12, 2007 are inconsistent with objective medical evaluations by Drs. Grossman, Nagy, and DuPuy and are not accepted as credible by the Full Commission.
46. Plaintiff sustained an injury by accident arising out of and in the course of his employment on May 24, 2007, which injury consisted of a soft tissue injury to his lower right leg. Plaintiff did not sustain any injury to his back as a result of the accident on May 24, 2007. As a result of that injury, plaintiff was restricted to modified duty work within the restrictions assigned by Dr. Grossman from May 25, 2007 until June 12, 2007.
47. Defendant did not offer modified duty work to plaintiff until May 29, 2007, but on that date, which was within the seven day waiting period, defendant offered suitable modified duty work to plaintiff that was within the restrictions assigned by Dr. Grossman. Plaintiff successfully performed that modified duty work on May 29, 2007. Defendant continued to offer suitable modified duty to plaintiff from May 30, 2007 to June 4, 2007, but plaintiff unjustifiably refused said suitable employment. Plaintiff offered excuses for not reporting for work, but they were not justified, and at no time was he totally disabled from working or authorized to remain out of work by his treating physician, Dr. Grossman.
48. Plaintiff reached maximum medical improvement from his right leg injury on June 12, 2007, when he was released by Dr. Grossman. On that date plaintiff was physically capable of returning to regular duty work with no restrictions.
49. Since June 12, 2007, plaintiff has been capable of full duty work with no restrictions. *Page 17 
50. The medical treatment received by plaintiff since his release by Dr. Grossman on June 12, 2007 was not authorized by defendant and was not reasonably required to effect a cure or give relief as a result of plaintiff's compensable injury on May 24, 2007, and plaintiff does not require any medical treatment in the future as a result of that injury.
51. On or about May 25, 2010, plaintiff filed with the Industrial Commission a new Form 18 dated "5/__/10," on which plaintiff alleges for the first time that he also injured his back as a result of the accident on May 24, 2007. At no time during the hearing of this matter before the Deputy Commissioner on February 12, 2009, or during the depositions of Drs. Grossman, DuPuy, and Nagy, or in the filing of contentions, did plaintiff ever allege or contend that he injured his back as a result of the accident on May 24, 2007 or raise any issue regarding his back. Plaintiff offered no lay or expert medical testimony regarding any injury to his back. Defendant's receipt of plaintiff's new Form 18 on or about May 25, 2010 was its first notice that plaintiff was alleging injury to his back as a result of the accident on May 24, 2007.
52. Defendant has paid no indemnity compensation to plaintiff, and its last payment of medical compensation was on June 27, 2007.
53. Plaintiff did not offer any reasonable excuse for his failure to give timely written notice of his alleged back injury to the defendant, and defendant has been prejudiced by that lack of timely notice.
 *********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW *Page 18 
1. Plaintiff sustained an injury by accident arising out of and in the course of his employment on May 24, 2007, which injury consisted of a soft tissue injury to his lower right leg. Plaintiff did not sustain any injury to his back as a result of the accident of May 24, 2007. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was capable of modified duty work within the restrictions assigned by Dr. Grossman from May 25, 2007 through May 28, 2007, and defendant did not offer suitable modified duty work to plaintiff during that period. Plaintiff is not, however, entitled to compensation for disability during this period because it falls within the statutory seven day waiting period. N.C. Gen. Stat. § 97-28.
3. Defendant offered suitable modified duty work to plaintiff from May 29, 2007 through June 4, 2007. Plaintiff successfully performed that modified duty work on May 29, 2007, but from May 30, 2007 through June 4, 2007 plaintiff unjustifiably refused suitable modified duty work offered to him by defendant, such that he is barred from receiving any compensation for disability during that period. N.C. Gen. Stat. § 97-32.
4. On June 5, 2007, plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by defendant. Plaintiff's misconduct is deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless plaintiff is able to show that his inability to find or hold other employment is due to a work related disability. McRae v. Toastmaster, Inc.,358 N.C. 488, 597 S.E.2d 695 (2004); Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228, 472 S.E. 2d 397 (1996). Plaintiff has failed to meet his burden of establishing disability as a result of the May 24, 2007 injury following his *Page 19 
termination on June 5, 2007. N.C. Gen. Stat. §§ 97-29, 97-30;Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E. 2d 454 (1993).
5. Plaintiff reached maximum medical improvement from his May 24, 2007 injury on June 12, 2007, when he was released by Dr. Grossman capable of full duty work with no restrictions. Plaintiff did not sustain any permanent injury or permanent partial impairment to his right leg as a result of the accident on May 24, 2007 and is, therefore, not entitled to any compensation. N.C. Gen. Stat. § 97-31.
6. Defendant is responsible for payment of the expense of medical treatment by Dr. Margaret Grossman at Concentra Medical Center, if not already paid. Plaintiff has failed to meet his burden of proving that he is entitled to any other incurred or future medical compensation under the Act, and defendant shall not be responsible for the unauthorized treatment received by plaintiff from Dr. Christopher K. Nagy. N.C. Gen. Stat. §§ 97-25, 97-25.1.
7. Plaintiff's claim for any injury to his back as a result of the accident on May 24, 2007 is barred by the two year limitations period in N.C. Gen. Stat. § 97-24.
8. Even if plaintiff's claim for any injury to his back were not barred by the two year limitations period in N.C. Gen. Stat. § 97-24, then his claim for an alleged back injury is barred by his failure to give timely written notice of that alleged injury to his employer within thirty days thereof, for which delay plaintiff offered no reasonable excuse, and which delay caused prejudice to defendant. N.C. Gen. Stat. §§ 97-22, 97-23.
9. To the extent plaintiff's new Form 18 may be construed as an attempt to reopen his claim on the grounds of an alleged change of condition, such attempt is barred by the provisions of N.C. Gen. Stat. § 97-47, in that the new form 18 was filed more than twelve months *Page 20 
after defendant's last payment of medical compensation on June 27, 2007. N.C. Gen. Stat. § 97-47.
10. Even if plaintiff's claim for an alleged injury to his back on May 24, 2007, is not otherwise barred by the provisions of the Act, said claim for any alleged back injury, made approximately three years after the date of the accident on May 24, 2007, with no prior notice to defendant, and after three years of litigation by the parties, is barred by the doctrines ofres judicata, collateral estoppel, equitable estoppel, and/or laches.
 *********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This the 12th day of July, 2010.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 21 
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1